ORD. PET.          McMillan *vs.* Maysville and Lexington Railroad
                                    Company.

Case 29.                     APPEAL FROM NICHOLAS CIRCUIT.

1. The appellant, with others, agreed to pay to the Maysville and Lexington Railroad Company on each share of stock subscribed by them, upon condition that said railroad should be so located and constructed as to make the town of Carlisle a point, "at such times and places as may be required by the board of directors." Held—that the subscribers were bound to pay their subscriptions upon the *location* of it so as to make Carlisle a point, and that its construction by the company was not a condition precedent.

2. In the construction of contracts, the object and purpose of the parties is to be considered, and such a construction given as will carry the intention into effect. In this case the object and intent of the parties was to use the fund in the construction of the road.

3. Under the provisions (*Session Acts of* 1849–50, *section* 24,) the President and Directors of the Maysville and Lexington Railroad Company had a right to make a conditional sale of the stock to the subscribers. The subscribers did not become stockholders until they performed the condition on which their subscriptions were made.

4. The failure of the company to complete the Maysville and Lexington Railroad did not have the effect to release subscribers for stock from the payment of their subscriptions. *They may be necessary to pay debts incurred.*

Case stated.           This suit was brought by the Maysville and Lexington Railroad Company against McMillan, to compel the payment of ten shares of stock in said road, alleged to be due upon the subscription of the defendant. The following is the subscription paper which is the foundation of the suit: "We, the undersigned, citizens of Nicholas county, State of Kentucky, hereby subscribe for the number of shares in the capital stock of the Maysville and Lexington Railroad Company set opposite our names respectively, and hereby promise and agree to pay fifty dollars on each share so subscribed in such installments and at such times and places as may be required by the board of directors of said road company, upon condition that said road shall be so located and con-

structed as to make the town of Carlisle a point in said road: otherwise these subscriptions shall be null and void." The appellant demurred to appellee's petition, which was overruled. The appellant answered, which was demurred to, and the demurrer sustained to the second and third paragraphs of the answer; an amended petition was filed which was demurred to, and the demurrer overruled, a trial had, and judgment for the appellee, from which the appellant prayed an appeal.

*Garrett Davis*, for appellant—

The subscription of the appellant contains two distinct and substantive conditions, viz: The *location* and *construction* of the road so as to make Carlisle a point in it. It is insisted for the appellant that both the *location* and *construction* of the road are conditions *precedent;* and that both are to be performed before he can be required to pay the subscription. In regard to the location of the road, this position was conceded in the court below; it is supposed will not be controverted in this court. The parties have "so nominated it in the bond," and when it is expressed that the subscription shall be void, unless the road is located by Carlisle, it would be preposterous to contend that the money could be collected, and the subscription thus made absolute before the road was located any where. Both conditions are imposed by the same language, and if the road is to be *located* before the subscription is due and payable, how can it be contended that the road is not also to be *constructed* before it is due and payable? Suppose that the language of the condition was, "that the road should be located and *finished* by Carlisle, otherwise the subscription to be null and void," could it be reasonably argued that the subscription was due until the road was finished? Such a position would be against the express contract of the parties. Is not the language of the contract sued on of the same legal import? What is the sense of the term *constructed*

McMILLAN<br>vs.<br>MAYS. & LEX.<br>RAILROAD CO.

but "*built*"—the parts being put together or *finished.*" The location of this road is of no utility to the plaintiff, or to the country, unless it is also built; and the same considerations which require the road to be located before the payment of the money would reasonably induce the subscriber to require that the road should be constructed before payment. Indeed the motive for imposing the last condition would be stronger than those that would suggest the first, because of the greater difficulty and therefore improbability of performing it. But in the construction of this contract, it is sufficient to say that the parties have written it so as to require the road to be both *located* and *constructed* before the subscription is due, by declaring it shall be *null* and *void* if the road is not both *located* and *constructed* by Carlisle.

If the subscription may be first collected, it would be absurd to say that non-performance of either of these conditions would render it null and void. The condition of construction has not yet been performed and it is proved that it will require from five to seven hundred thousand dollars to enable the company to perform it. It is possible, it is altogether probable, that it never will be performed, and after the subscription is collected and applied, and the work unfinished, how can it be null and void? It was to meet just such a state of case that construction as well as location was made a condition precedent, and the appellant cannot be deprived of the benefit of the condition by being made to pay his subscription before the road is finished, without an alteration of the contract.

It may be urged that the purpose of subscriptions to roads is, that they may be applied from time to time as shall be necessary in constructing the roads; and that the object of such subscriptions would be defeated by the construction contended for. This argument might have weight, and even a controling influence, in cases of ambiguity and doubt, but cannot apply in the present case, because the words of the

contract are reasonably plain and clear. The appellee might consent to receive subscriptions on these terms, and the appellant might refuse to make them on any other. It is well known in what various forms subscriptions are made and received to these road companies, and because the present form is in an objectionable form it is no reason why it should not be adhered to, when its language is plain and obvious in its sense and effect.

It may be said that no road could be constructed upon subscriptions made upon the principle which is contended for. This position is plausible; but it does not follow that all the subscriptions of stock are in the form of this particular one. We know too that if those who solicit subscriptions cannot get them in a particular form, they will take them in any form, and the same road may have them in various and even conflicting forms, with great diversity of phrase and language. There is usually so great a desire to swell the amount of the subscriptions that they are readily received upon any terms, and in any language the subscriber may require. All these aids in the construction of contracts are so various and uncertain, and even conflicting, as not to be entitled to much consideration, certainly not enough to control the language of a contract which is reasonably certain. It is safer to look to that language mainly, if not exclusively, for the true intent and contract of the parties. But looking to all the facts and circumstances that surround the subject matter of this contract, and the parties to it at the time, it is seen that the work is undertaken with very inadequate means. That the probability of raising a sufficiency to complete the road is altogether uncertain, and that those who subscribed their money to make it might be required to pay it, and still get no road. Such is not only the fact in relation to the Maysville and Lexington Railroad, but it is now and for years has been a very common case in the United States. If it was the intention of the appellant to pay his subscription, it

McMILLAN
*vs.*
MAYS. & LEX.
RAILROAD Co.

cannot be supposed that he intended to pay it whether the road was made or not. If that had been his purpose, the subscription would have said noting about being *null* and *void* in the event of the road not being constructed, but would have made its payment dependent alone upon the location of the road by Carlisle. The insertion of the condition of its construction surely means something. And if the plaintiff intended to pay his stock to assist in making the road, it cannot be denied that he intended at the same time that the road should be made. It is plain he did not intend to pay his money, road or no road. He did not intend to pay if he was the only subscriber, nor if the means were entirely inadequate to make it, nor indeed unless the road was made, and therefore he intended to withhold his subscription until the company had raised the means to construct the road. It is the duty of the appellees to show that enough has been subscribed, with that subscribed by the appellant, to complete the road; without doing so there can be no recovery. If the construction of the contract which the appellee contends for is to prevail, whenever the road was located to pass by Carlisle, if the appellant's subscription had been the only remaining resource left to the company, it would have been their right to enforce its collection, though a spade had never and never was to be struck in the construction of the road. The plaintiff has not made such a contract as that.

2. It is contended that the plaintiff's subscription is not legal and binding. 1. Because it should have been absolute and unconditional. 2. Because at the time of the subscription the appellant neither paid nor was he required to pay the two per cent. on the amount subscribed which the charter required then to be paid. (*Sess. Acts of* 1849–50, *page* —.)

The charter required $—— of stock to be subscribed before the company could be organized, and before the corporators could enter upon their important franchises. The capital stock is generally, in the

first instance, the sole means of corporations, and by which it is held to responsibility in its various transactions in society, and surely when a charter does not authorize stock to be subscribed conditionally, but in simple terms requires that it be subscribed, the subscription must be made absolutely and unconditionally. A conditional subscription is not capital stock. Suppose all the stock to this road had been subscribed upon the same, or similar conditions, as the one under consideration? There would have been no legal stockholders, and the company could not have been legally organized, and could not have secured the privileges intended by the charter, for want of the requisite amount of stock.

Suppose the stock immediately on subscription to have been valuable and commanded a price above par, and there had been an excess, but some conditional, and some unconditional, would any court hesitate to award the stock to the absolute subscribers, upon the principle that they alone were the legal subscribers? The stock must have been subscribed in conformity with the provisions of the charter, and that authorized no conditional subscriptions. The same argument applies in regard to the payment of the two per cent. at the time of subscribing. Those alone who paid it were the true and legal stockholders. (*See Angel and Ames on Corporations*, 417; 1 *New York Term Rep.* 392.)

The court below erred in not sustaining the demurrer to the petition, and in sustaining the demurrer to the second and third paragraps of the answer of appellant. A reversal is prayed for.

*T. E. Quisenberry*, on the same side—

The appellee avers a strict performance of all the conditions. That is to say, that the Maysville and Lexington Railroad Company, after said subscription was had, proceeded to locate and construct said road so as to make the town of Carlisle a point. The second averment is that the said company, after the

McMillan.<br>vs.<br>Mays. & Lex.<br>Railroad Co.

McMillan
vs.
Mays. & Lex.
Railroad Co.

said road had been so located and constructed as to make the town of Carlisle a point, required the defendant, (pursuing the language of the subscription,) to pay the several installments of his stock so subscribed to John Dougherty, their agent in Carlisle.

The appellant answered, first traversing the allegations that the road had been so located and constructed as to make Carlisle a point in the road. The other matters set up in the answer were adjudged insufficient on demurrer, and will not be further noticed here. The questions arising upon the issue so joined is what is now to be considered, when the question arising on the demurrer will be considered.

1. Broderick was an incompetent witness for appellees, and should not have been permitted to testify. He was a stockholder, and though his interest might be small, yet it was certain. If the subscriptions could not be collected, the road could not be built—if the road could not be built there could be no dividend. If the road was delayed in its completion, dividends would be delayed.

2. The court below erred in its instruction to the jury, especially in the form. The court told the jury, at the instance of appellees' counsel, "that if they believed the testimony they were bound to find for the plaintiff." This form of instruction to the jury we think clearly erroneous. The issue to be tried by the jury was whether the company had located and constructed the road so as to make Carlisle a point. On the trial of this issue the proof showed that the road had been located so as to make Carlisle a point, but that the road had not yet been constructed. The court however said to the jury that if they believed the evidence they must find for the company. This mode of instructing juries has always been regarded as erroneous. In the case of *Reed vs. Bragg,* 5 *J. J. Marshall,* 620, the court reversed the case on this point alone. To weigh the evidence and decide the facts, has always been regarded as the province of the jury. The court gives the law and leaves the jury

to decide the facts, and upon the law and facts decide the case. Any form of instruction which trenches upon the right of the jury to decide the facts is objectionable.

The question arising upon the demurrer is next in order. The appellee filed an amended petition, in which it is averred that the road was located so as to make Carlisle a point, but failing to aver that it had been so constructed, but that it was in process of construction. It is further averred, by way of explaining the covenant sued on, that the money subscribed was intended to aid in the construction of the road, and that it was needed for that purpose. To this amendment a demurrer was filed, which was overruled, of which appellant complains. This decision implies that the appellees were authorized to sue and recover the subscription before the road was constructed as contemplated by the terms of the agreement, and that the condition, (or part of it at least,) was to be disregarded. The court, in so deciding, determined that the agreement meant one thing, when by its terms it clearly appears it meant another; that is to say, that the object of the subscription was to procure means to make the road, and that it never was intended to make the road without these means. Such an argument would be plausible, but for the facts which appear contradicting it. We say the contract means what it says: that is, that the road shall be first located *and constructed,* so as to make the town of Carlisle a point, otherwise to be null and void. There is no ambiguity about it. It is a plain, simple, and direct covenant by the appellant to do one thing when the appellees had done another. The condition in the covenant was and is a condition precedent. The road was to be located and made so as to make Carlisle a point in it. When that was done the appellant was bound to pay the stock subscribed, in such installments, at such times and places, as the board of directors might require. If, on the contrary, the road was not so lo-

cated and constructed, the obligation was to be null and void; and when an agreement is so plain, what court can by artificial rules of construction or right, say that it means anything else. The parties have said that the road shall be *located and constructed* so as to make Carlisle a point, otherwise the defendant was to pay nothing. The company, by bad management or other causes, have failed to make the road, and in their efforts to do so have become greatly involved in debt, suspension of the work follows, and in that state of case the company seek to enforce this subscription. It is to be hoped that all the contracts of the company were not upon the same condition.

The record shows an expenditure already of $1,-600,000—more than enough to have made the road to Carlisle, if it had been judiciously expended—which is about the amount the subscribers were made to believe would complete the road from Lexington to Maysville. Having so large a fund absolutely, there was no reason why the company might not be willing to take conditional subscriptions, and obligate themselves not to demand it until the road was *constructed*.

But there is something strange in the construction which the court below gave to this covenant, when the 10th section of the act of incorporation is examined. By that section the company has the power, after the route is selected, to alter or change it whenever obstacles to the continuance of the location might occur, such as the difficulty of construction and procuring the right of way, or when a cheaper and better route might be obtained. The court will perceive by examining the entire act that there were but two points fixed by the charter: Maysville and Lexington. All intermediate points were left open in order to create competition, and obtain a larger subscription of stock. The citizens of Carlisle, and those friendly to that point, knowing the provisions of the charter, were unwilling to make an unconditional sub-

scription of stock to the road; but proposed and ultimately agreed, that if the board would take a subscription on the conditions named, whereby the subscribers would be independent of the power of the company to change the route when once located, by having the road *located and finished* to Carlisle, they get the road where they desired it. They were unwilling to subscribe on the single condition of the *location*, because they saw that might be changed at any time before completion, hence the word *constructed* was introduced, and *located* and *constructed* are both used in the contract.

Chitty, in his work on contracts, page 69, after laying down the rules which should govern in the construction of contracts, says that in case of a bond with a condition, the condition may be read and taken into consideration, in order to correct and explain the obligatory part of the instrument, and words may be transposed, if it be necessary to do so, in order to give effect to the intent of the parties. Suppose under this rule we transpose the words of this agreement, and place the conditional before the obligatory part. If possible to make what is already plain more so, this would certainly effect the object. The agreement would then read as follows: "On condition that the directors of the Maysville and Lexington Railroad Company so *locate* and *construct* their road, as to make the town of Carlisle a point in said road, then we, the subscribers, agree and bind ourselves to pay, &c.; otherwise the agreement is to be null and void." Now it is plain that the words of the agreement thus transposed means nothing more nor less than they do without the change; and with the words so placed, who can doubt that the words mean what we contend for as the proper construction? If I agree to pay so much money upon the location and construction of a building of certain dimensions, otherwise my agreement to be null and void, can it be contended that I was to pay before the building was constructed, because the obligee says,

McMillan
*vs.*
Mays. & Lex.
Railroad Co.

sir, how did you expect me to build your house without the money with which to do it? Two rational persons could never differ about the construction of such an agreement, and never have called upon a court of justice to determine its construction. Why should the case be different between a natural person and a soulless corporation, having no sense? We had rather supposed that the acts of corporations were to be scrutinized more closely than those of individuals, if any difference was to be made, and the most rigid rules applied to their acts and contracts under their charters. If there be any uncertainty in the construction of the contract of a corporation with a private person, the advantage should be given to the weaker party. The Circuit Court has reversed this rule which we contend for, and given the corporation the benefit of what it considered a doubt in construction. The judgment of the court is that the stock is to be paid, road or no road. The work is now wholly suspended, and no means to construct the road, and it may be that if it ever shall be revived, the route may be changed. The proof shows that but little work has ever been done about Carlisle.

But it has been said that in construing the contract its nature and design should be considered. To this we are disposed to offer no objection, and so have considered it. We now propose to show that the company under their charter had no power to take a conditional subscription of stock, and that such a form of subscription was never contemplated by the charter, and that the appellees have no right to ask the aid of the court to enforce a subscription not authorized by the charter. It is well settled that corporations have no powers but such as their charters confer. What is the mode prescribed for obtaining the capital stock of this company? The attention of the court is called to the 2d, 3d, 4th, 5th, and 6th sections of the act of incorporation, which, taken together, show all the steps to be taken to procure

the stock, which, when so made, the corporation has the power to collect by the 14th section. The act authorizes no conditional subscriptions, and taking them upon any condition whatever, was without authority of the charter. The making up of the stock of the company was the most important duty of the company—the basis of all its future action and usefulness; and the powers of the corporation in regard to it should have been strictly pursued. It was the basis of all payment and future efficiency of the corporation. The community had a right to expect faithfulness in the discharge of this duty by those to whom it was committed, and a strict adherence to the provisions of the charter. Good faith to those who might deal with the company required this.

3. The answer alleges the inability of the company to make the road without the aid of appellant's subscription, and all other means in the power of the company. If this be true, as assumed upon demurrer, then the road will never be constructed. Viewing the covenants as *concurrent*, then the law is that the plaintiff must show ability to comply on his part before he can insist on performance by defendant.

It is contended—1. That the subscription of the appellant was conditional. 2. That the condition has not been performed. 3. The jury should have been permitted to find the facts put in issue without any such instruction as was given. And that a reversal should be the consequence.

*F. T. Hord*, for the appellees—

It is insisted by appellant's counsel that there can be no recovery of the subscription of McMillan until the road has been constructed, and Carlisle is made a point in the road. This is the great point in dispute, and which arose upon the petition and amended petition filed. A perfect completion of the road from Maysville to Lexington is insisted upon as a condition precedent to enforcing the subscription.

McMILLAN
*vs.*
MAYS. & LEX.
RAILROAD CO.

It is worthy of observation that McMillan does not state that such was the contract in his answer filed, and we insist that such is not the proper construction of the contract.

"The intention of the parties is a fundamental and should be a governing principle in the construction of all instruments; and when the language is ambiguous or of doubtful import, it is allowable to look behind the instrument into the state and condition of the parties, their motive, object, and end in its creation as a means of leading to a proper understanding of its import. And further, the cotemporaneous construction and action of the parties interested under it, is entitled to great weight, and should be conformed to, carried out, and sustained if it can be done without doing violence to its terms. (2 *B. Monroe*, 166; 4 *J. J. Marshall*, 219; 5 *B. Monroe*, 499; 8 *Ib.* 425; 9 *Ib.* 168, 384.)

"The principal object of inquiry in the construction of contracts, is the intention of the parties to the instrument: to aid and carry that intention into effect, the law, when it becomes necessary, will control even the literal terms of the contract, if they manifestly contravene the purpose, and many cases are given in the books in which the plain intent has prevailed over the strict letter of the contract. (1 *Kinnie's Law Compendium*, 230; *Co. Lit.* 45 *a*, 301 *b*, *Lord Hardwicke;* 2 *Atkins*, 32; *Lord Chanceller Willis; Parkhurst vs. Smith, Willis' Rep.* 332; *Hotham Bar and Thompson Bar*, 1 *H, Black. Rep.* 385–6, 595; *Lord Kenyon in Sallock vs. Harris*, 3 *Term Rep.* 181; *Pothier on Oblig.* 91.)

"Again: when the terms of a promise admits of more senses than one, the promise is to be performed in that sense in which the promiser apprehended, at the time the promisee received it. (*Chitty on Contracts*, 62.)

The foregoing are some of the fundamental principles upon which all contracts are to be construed. What then was the intention of the parties to this

contract? To ascertain it let us advert for a moment to the circumstances under which this subscription was gotten up. A great thoroughfare was in contemplation. Means were being raised for its construction. There were several routes proposed and surveyed. The people on the different routes were anxious to secure the location, and competed as to which route should secure the largest subscription to assist in building the road; and it was believed the size of the subscription would determine the location of the road, other things being equal. More money was subscribed to the route to run through Carlisle, and the location was secured to run through that place, and upon the faith of the subscription for that route it was put under construction, and a large amount of money has been since expended upon it, as the testimony clearly shows. The company has been induced to expend this money upon this route upon the faith of the subscription, and can it now be said that the subscribers were not to pay until the road was completed? Could the appellant, and others who signed this subscription, have supposed that such was the terms of payment? or that the company would have accepted a subscription on such terms? Certainly they could not. If such was the understanding of the appellant, why did he promise to pay fifty dollars on each share subscribed, *"in such installments and at such times and places as might be required by the board of directors of said company?"* Was not the motive, the object, and the aim to obtain these subscriptions to assist and aid in the building of this road; provided, when constructed, it should make Carlisle a point? Was not this the understanding of those who subscribed and those who accepted the subscription? Such we believe, from the instrument itself, to have been the intention of all the parties; any other construction would defeat the end and object of the subscription, and of the parties to the contract.

McMILLAN
*vs.*
MAYS. & LEX.
RAILROAD CO.

Again: "Every contract ought to be so construed as to give effect to the real intent of the parties, to be collected from all the terms of the agreement; and when the expressions are equivocal, such intent, gathered from the whole of the instrument, must determine the meaning of such expressions. If the terms conflict, or are so inconsistent that the intent of the parties cannot be ascertained, the contract may be nugatory, by reason of such uncertainty—a consequence which should be avoided if possible. The parties must have intended something by their agreement." Therefore, in an action by W. L. F. upon a note made by T. C. in these words: "If William Cobb, who is now prosecuted on a charge of murdering M. is not found guilty of murder in the first degree and sentenced for that crime, I will pay to W. L. F. the sum of $200, on or before the 12th of September, 1819." It was contended by the defendant, who pleaded that the prosecution was still pending, that the plaintiff was not entitled to the money until W. C. was acquitted; but the court held the contract to be that the money should be paid, if the accused was not convicted by or before the time appointed for payment, and that a stipulation to pay on a particular day, unless some event should happen, which in its nature may happen, either before or after that day, implies that the money is to be paid, if the event do not happen before that day." (*Cobb vs. Fontaine*, 3 *Randolph*, 487, note to 1 *Chitty*, page 84.)

In construing contracts, the court will look to the motives which led to it, and the object intended to be effected by it. (*Davis vs. Birney*, 2 *Gill & Johnson*, 382, cited in *Chitty on Con.* in note page 80.)

The only difference in the case cited from Randolph and the case under consideration is, that in the case in Randolph the money was to be paid on or before a particular day. In the case under consideration the money was to be paid at such times and places as might be required by the board of directors of the

railroad company—equally as strong a case as that in Randolph.

Broderick was a competent witness. (*See Code of Practice, section* 675; *Danville T. P. R. Co. vs. Burdett,* 7 *Dana,* 99.) We look upon these authorities as conclusive of the case, and that the judgment should be affirmed.

Judge SIMPSON delivered the opinion of the Court—

The obligors, among whom the appellant was one, agreed to pay to the Maysville and Lexington Railroad Company $50 on each share of stock, subscribed by them, upon condition that said road should be so located and constructed as to make the town of Carlisle a point, otherwise the subscriptions were to be null and void. Now this stock was to be paid only upon the condition that the road should be so located and constructed as to make the town of Carlisle a point. But when was it to be paid? The appellant contends that it was not to be paid until the road was finished, and that such is the meaning of the stipulation that the road should be *so located and constructed* as to make the town of Carlisle a point, otherwise the subscriptions were to be null and void.

The place and not the extent of the construction of the road was evidently referred to in this stipulation. The stock was to be paid, if the road was so constructed as to make the town of Carlisle a point, not when the construction of the road should be completed. But the writing itself fixes the time of payment. By it the subscribers agreed to pay the stock subscribed by them, in such installments, and at such times as might be required by the board of directors of said company. In giving construction to the instrument the whole of it must be considered. Now it is evident, looking to all the stipulations contained in it, that the entire construction of the road was not understood or intended by the parties to be a precedent condition to the payment of the stock. The construction, and payment of the stock, were to be

1. The appellant, with others, agreed to pay to the Maysville and Lexington Railroad Company on each share of stock subscribed by them, upon condition that said railroad should be so located and constructed as to make the town of Carlisle a point, "at such times and places as may be required by the board of directors." Held—that the subscribers were bound to pay their subscriptions upon the *location* of it so as to make Carlisle a point, and that its construction by the company was not a condition precedent.

concurrent acts. No payment was to be made unless the road was so constructed as to make the town of Carlisle a point, but if it were constructed in that manner, the payment was to be made, at such time and place as the board of directors might designate.

But if, instead of restricting ourselves to the letter of the instrument, to ascertain its true meaning, we take into consideration the object to be accomplished by the subscription, the nature and extent of the enterprize in which the parties were embarking, and the means by which it was to be effected, no difficulty can exist in determining the intention of the parties, or in giving such an exposition to the writing as will be consistent with it. The stock was subscribed for the very purpose of aiding in the construction of the road. To effect this object it must be paid as the work progresses. The postponement of its payment, until the work should be finished, is inconsistent with the very end to be accomplished by it. No road could ever be made on this principle, and therefore it cannot be supposed that these stockholders could have intended that the payment of the stock subscribed by them should not be made until the work had been completed. They desired to make the town of Carlisle a point in the road, and the payment of their stock was made to depend upon that condition. The road has been so located as to effect that object, and it is incumbent on them, according to any fair interpretation of their agreement, to pay the stock subscribed by them, to aid in its construction.

It is also contended, on the part of the appellant, that the agreement sued on is void, on the ground that the company had no authority under their charter to receive any but unconditional subscriptions of stock.

By the 24th section of the charter, (*Session Acts*, 1849–50, *page* 302,) the president and directors were authorized to sell or dispose of the unsubscribed stock for the benefit of the company. The only limit

*2. In the construction of contracts, the object and purpose of the parties is to be considered, and such a construction given as will carry the intention into effect. In this case the object and intent of the parties was to use the fund in the construction of the road.*

*3. Under the provisions (Session Acts of 1849-50, section 24,) the Presi-*

on this power was that the stock should not be disposed of under its par value. The right to make a conditional disposition of the stock seems to be unquestionable, under this provision in the charter. The substance of the agreement of the company, and the signers of the instrument of writing sued upon was, that if the former would locate the road so as to make the town of Carlisle a point, the latter would take the amount of stock subscribed by them. When the road was thus located, the signers became unconditional stockholders, and as such were entitled to all the corporate rights and privileges of members of the company. The stock itself was not conditional; it was only the agreement to take it that was conditional. The subscribers were not stockholders until the company had performed the condition upon which their undertaking depended, and when that was done, they became stockholders by force of the agreement of the parties. The acquisition of stock in this manner was in our opinion sanctioned by the foregoing section of the charter, and does not seem to be prohibited by sound policy, or by any of the other provisions in the statute. Besides it has been usual under similar charters to make contracts of this kind, which fact, although insufficient of itself to give validity to such subscriptions of stock, may very properly be referred to for the purpose of showing the cotemporaneous construction which has been given to charters containing similar provisions.

The other matters of defense set up and relied upon in the answer are obviously untenable. The fact that the company have suspended operations upon the road, and that it will require a large additional expenditure of labor and money to complete its construction, and even the additional fact that the means of the company are wholly inadequate to the accomplishment of this object, do not furnish any sufficient reason why the defendant should not pay his stock. It may be, and probably is necessary, to

---

McMillan
vs.
Mays. & Lex.
Railroad Co.

dent and Directors of the Maysville and Lexington Railroad Company had a right to make a conditional sale of the stock to the subscribers. The subscribers did not become stockholders until they performed the condition on which their subscriptions were made.

4. The failure of the company to complete the Maysville and Lexington Railroad did not have the effect to release subscribers for stock from the payment of their subscriptions. They may be necessary to pay debts incurred

aid in the payment of debts already incurred in the work previously done upon the road, or it may be required for the purpose of assisting in its further prosecution. The defendant could only be absolved from liability for the payment of his stock, by alleging and proving a final abandonment of the work by the company, and also that its payment was not necessary for the purpose of satisfying any existing demand against the corporation.

Wherefore, the judgment is affirmed.